J-A15040-24 & J-A15041-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.T.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.D.-J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 201 MDA 2024 |

Appeal from the Decree Entered January 10, 2024
In the Court of Common Pleas of York County Orphans' Court at No(s):
2023-0140a

| | | |
|---|---|---|
| IN RE: ADOPTION OF: S.Y.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.D.-J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 202 MDA 2024 |

Appeal from the Decree Entered January 10, 2024
In the Court of Common Pleas of York County Orphans' Court at No(s):
2023-0168a

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.T.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.J.C., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 205 MDA 2024 |

Appeal from the Decree Entered January 10, 2024
In the Court of Common Pleas of York County Orphans' Court at No(s):
2023-0140a

J-A15040-24 & J-A15041-24

IN RE: ADOPTION OF: S.Y.C., A           :      IN THE SUPERIOR COURT OF
MINOR                                    :              PENNSYLVANIA
                                         :
                                         :
                                         :
APPEAL OF: R.C., JR., FATHER             :
                                         :
                                         :
                                         :
                                         :
                                         :      No. 206 MDA 2024

Appeal from the Decree Entered January 10, 2024
In the Court of Common Pleas of York County Orphans' Court at No(s):
2023-0168a

BEFORE:   DUBOW, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED: SEPTEMBER 6, 2024**

In these consolidated cases, S.D.-J.C. ("Mother") and R.J.C., Jr. a/k/a R.C., Jr. ("Father") (collectively, "Parents") appeal from the January 10, 2024 decrees that granted the petitions filed by the York County Office of Children Youth and Families ("CYF" or "the Agency") and involuntarily terminated their parental rights to their biological son, J.T.C., born in December 2018, and their biological daughter, S.Y.C., born in February 2023 (collectively, the "Children").[1]  After careful consideration, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] We have consolidated these cases **sua sponte** pursuant to Pa.R.A.P. 513 ("Where there is more than one appeal from the same order, or where the same question is involved in two or more appeals in different cases, the appellate court may, in its discretion, order them to be argued together in all particulars as if but a single appeal.").  Instantly, Parents have raised identical claims concerning the same factual and procedural events.

We glean the relevant factual and procedural history of the above-captioned cases from the certified record. Initially, we note that Parents are not married and have been in an "on and off relationship" since 2018, which has been largely characterized by mutually abusive behavior and a history of escalating arguments. *See* CYF Exhibit 9 at 3-5. Since it is relevant to our disposition, we also preliminarily note that Mother also developed a "close relationship" with another individual, J.J., beginning in February 2021. *See id.* at 3. As discussed further *infra*, Mother's relationship with J.J. has also been marred by similar allegations of troubling domestic violence.

CYF became involved with Parents' family shortly after January 14, 2021, when the Agency received a referral that J.T.C. had been found alone and crying at 1:30 a.m. in a hallway of the hotel where Mother and her mother ("Maternal Grandmother") were then residing. Subsequent investigation by the police revealed that Mother had left J.T.C. unsupervised while Maternal Grandmother was sleeping in their shared hotel room unaware that Mother had left. This was the second incident in which J.T.C. had been discovered unattended in the public spaces of the hotel. In February 2021, Mother was charged with endangering the welfare of a child ("EWOC") in connection with these events. The Agency also learned that Mother was previously indicated as a perpetrator of sexual abuse while she was still a minor.

Contemporaneously, CYF's investigation revealed that Father was incarcerated at SCI Greene due to a parole violation with an anticipated

release date in July 2021. Given the breadth of Father's criminal history, it is difficult to parse the precise nature of his incarceration at the inception of the Agency's involvement. Specifically, Father pled guilty to a litany of crimes between 2011 and 2018, including, but not limited to, EWOC and seven separate possessory offenses with respect to narcotics and paraphernalia.

J.T.C. initially remained in Mother's care after the Agency accepted them for services. However, Mother did not appropriately engage in the services offered by the Agency. Specifically, she was unsuccessfully referred to numerous parenting and therapeutic programs between February 2021 and June 2021, including Justice Works, Pressley Ridge, and Healthy Moms Healthy Babies. *See* Notes of Testimony ("N.T."), 10/31/23 at 63.

On June 30, 2021, CYF filed a dependency petition with respect to J.T.C. On July 16, 2021, CYF sought and was awarded emergency protective custody of J.T.C. and he was immediately placed in kinship care with P.R. ("Paternal Grandmother"). The same day that J.T.C. was placed in kinship care, Mother appeared at Paternal Grandmother's home and began "banging on the door and screaming for her to open up." Shelter Care Order, 7/19/21 at 2. Paternal Grandmother was eventually forced to call both the Agency and the police for assistance, although we discern that Mother departed before either organization could respond to the location. *See id.* Following this incident, Mother also began sending harassing text messages to Paternal

Grandmother's daughter. *See id.* J.T.C.'s placement was confirmed at a shelter care hearing three days later.

The court established J.T.C.'s initial permanency goal as reunification with Parents.[2] Parents were respectively ordered to, *inter alia*, undergo a psychiatric evaluation, follow the resulting mental health recommendations, and engage with parenting classes. *See* N.T., 10/31/23 at 40. Parents began participating in regular supervised visits with J.T.C., with Mother's participation being fairly consistent while Father's was sporadic, at best. A number of different organizations were involved in supervising these interactions including, *inter alia*, Catholic Charities.

Also in July 2021, Father was released from prison and briefly began residing with Mother at her apartment in York, Pennsylvania. He was imprisoned again, however, from December 2021 until April 2022 in connection with new criminal charges related to an incident wherein he attempted to strangle Mother. *See* N.T., 10/31/23 at 41-43.

Between September 2021 and December 2022, Mother completed a parenting class, progressed to weekly overnight visitations with J.T.C., and began mental health counseling at Commonwealth Clinical Group ("CCG"). Accordingly, the court restored physical and legal custody of J.T.C. to Mother on December 22, 2022, although J.T.C.'s dependency was not discharged.

_____

[2] In May 2023, J.T.C.'s permanency goal was to include a concurrent goal of adoption. *See* N.T., 10/31/23 at 67. Parents did not appeal this finding.

Following his release from incarceration, Father's whereabouts during this same time period were largely unknown and the court determined that his compliance with the existing permanency plan was minimal. Specifically, Father was unsuccessfully discharged from Catholic Charities in both November 2021 and June 2022 due to failure to engage. *See* N.T., 10/31/23 at 20-21, 61. He was also charged with simple assault and unauthorized use of a motor vehicle in connection with an incident that occurred in July 2022.

Contemporaneously, Mother's relationship with J.J. continued. In October 2022, Mother and J.J. were involved in an incident of domestic violence that led to J.J. being charged with simple assault and harassment. *See* Orphans' Court Opinion ("O.C.O."), 3/6/24 at 9 ("According to police . . . [J.J] physically attacked Mother during an argument inside a vehicle, ultimately grabbing her by the hair, dragging her out of the vehicle, and leaving her on the side of the road."). These charges were, ultimately, withdrawn after Mother refused to cooperate with the Commonwealth's efforts to prosecute J.J. *See id.* The certified record indicates that this was the "sixth or seventh time" that Mother had filed such charges, only to subsequently withdraw them. *See id.* at 10.

In February 2023, Mother gave birth to S.Y.C. and Father was released from prison shortly thereafter. On April 9, 2023, a violent domestic dispute occurred between Parents during an attempt to permit Father to visit with the Children following his release from incarceration. This rendezvous occurred

on the side of an unidentified public roadway, where Parents met after driving separately. *See* N.T., 1/10/24 at 83-84. Father arrived at the meeting under the influence of alcohol and with the smell of beer on his breath. *See id.* at 16. Mother attempted to prevent him from transferring the Children to his vehicle. *See id.* at 16. A physical struggle ensued, which culminated in Father successfully placing the Children into his automobile and attempting to depart despite Mother's attempts to physically prevent him from doing so. *See id.* Mother struck Father's rear window as he was driving away, which caused it to shatter. *See id.*

CYF sought and was awarded emergency protective custody of the Children the following day and a shelter care hearing occurred on April 25, 2023. The Children were placed in kinship care with their paternal aunt ("Paternal Aunt"). Safety concerns quickly arose, however, due to Mother's threatening behavior towards Paternal Aunt. *See* N.T., 10/31/23 at 53. Consequently, the trial court ordered that the Children be transferred to third-party foster care and directed that Parents be provided with no identifying information regarding the Children's foster parents ("Foster Parents"). *See id.* On May 3, 2023, S.Y.C. was adjudicated dependent and her initial permanency goal was established as reunification.[3]

---

[3] In August 2023, S.Y.C.'s permanency goal was amended to include the concurrent goal of adoption. *See* N.T., 10/31/23 at 67. No appeal was taken by Parents with respect to this determination. *See id.*

Of note, the trial court ordered Father have no contact with the Children on April 25, 2023. *See* N.T., 10/31/23 at 50. Between May 2023 and June 2023, Father was again incarcerated as a result of a new charge of terroristic threats. *See id.* at 42. Mother's issues with domestic violence with J.J. also continued. In July 2023, she was arrested and charged with simple assault and terroristic threats after she was alleged to have "stabbed" J.J. during an argument. *See* N.T., 10/31/23 at 43; N.T., 1/10/24 at 73-74. As a result, Mother was incarcerated from July 15 through August 1, 2023.

On August 16, 2023, CYF filed a petition seeking to terminate Parents' parental rights to J.T.C. pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). On August 29, 2023, the trial court reduced Mother's visitations with the Children to one hour of supervised contact per month. *See* N.T., 10/31/23 at 50. On September 20, 2023, CYF filed a petition to involuntarily terminate Parents' parental rights to S.Y.C. under Section 2511(a)(2), (3), and (b).[4]

On October 25, 2023, Mother filed a petition requesting a bonding assessment be performed by a "neutral third party" at the "expense of the County of York." Petition for Bonding Assessment, 10/25/23 at 1-3.

---

[4] For the purposes of compliance with 23 Pa.C.S. § 2313(a), we note that the orphans' court appointed Thomas L. Kearny, IV, Esquire, to serve as the Children's guardian *ad litem* and separately appointed Brandy G. Hoke, Esquire, to serve as the Children's legal interest counsel. Thus, we observe no structural error with respect to the Children's legal representation. *See generally In re Adoption of K.M.G.*, 240 A.3d 1218, 1234-1236 (Pa. 2020)

Concomitantly, Mother also requested that the termination proceedings be continued until the requested assessment could take place. *See id.* at 2-3.

The orphans' court held consolidated hearings on all three pending petitions on October 31, 2023, and January 10, 2024, at which time J.T.C. was approximately five years old, and S.Y.C. was just shy of her first birthday.[5]  At the beginning of the first hearing, the orphans' court denied Mother's request for a neutral bonding assessment.  Thereafter, the Agency adduced testimony from CYF supervisor Heather Sterner and Catholic Charities' family advocate David Kasberg.  Additionally, we note that CYF advanced an oral motion to incorporate the records of the Children's dependency proceedings, which was granted without objection.[6]  *See* N.T.,

---

[5]  During the October 31, 2023 hearing, Father left without explanation during a recess in the middle of the proceedings.  *See* N.T., 10/31/23 at 87.  The day after the first termination hearing, Father was taken into custody on a new parole violation.  *See* N.T., 10/31/23 at 13.  He testified that he expected to be released in approximately May 2024.  *See id.*

[6]  CYF originally requested that the orphans' court simply take judicial notice of the underlying records in J.T.C.'s dependency proceedings.  *See* Motion for Judicial Notice, 8/16/23 at 1-33.  The orphans' court granted this request in an order filed on August 28, 2023.  On September 20, 2023, a similar request for judicial notice was advanced with respect to the records concerning S.Y.C.'s dependency proceedings.  Our review indicates that the orphans' court never formally ruled on this petition.  This procedure was not proper.

This Court's persuasive precedent establishes that "the presence of evidence in the juvenile court does not excuse an agency from admitting that evidence into the orphans' court record during a termination hearing."  *In re T.B.*, 266 A.3d 609, 2021 WL 4551600, at *7 (Pa.Super. 2021).  Thus, "a court may not ordinarily take judicial notice in one case of the records of another case,
*(Footnote Continued Next Page)*

10/31/23 at 12. Mother and Father each appeared and testified upon their own behalf. Additionally, the Children's maternal grandfather, W.C., and Mother's paramour, J.J., also testified during the proceedings.

On January 10, 2024, the orphans' court filed decrees terminating Mother's parental rights to the Children pursuant to Section 2511(a)(1), (2), and (b). The court filed separate decrees terminating Father's parental rights pursuant to Section 2511(a)(2) and (b). On February 5, 2024, Mother filed timely notices of appeal along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On February 8, 2024, Father similarly filed timely notices of appeal along with concise statements. Thereafter, the orphans' court authored and filed a responsive and thorough opinion pursuant to Rule 1925(a)(2)(ii).

Parents have respectively challenged the evidentiary sufficiency of the orphans' court's findings pursuant to, *inter alia*, Section 2511(a)(2) and (b). *See* Mother's Brief at 6-7; Father's Brief at 5. Mother has also advanced a challenge to the orphans' court's denial of her request for a third-party bonding assessment. *See* Mother's Brief at 6-7.

Our standard of review in this context is well-established:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a

---

whether in another court or its own, even though the contents of those records may be known to the court." *Id.* As noted above, however, CYF later advanced an appropriate motion to incorporate the dependency records into the termination proceedings *sub judice*. Thus, we observe no error.

> determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.
>
> In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-830 (Pa.Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the

orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. *See M.E.*, 283 A.3d at 830 (citing *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*)).

Our analysis in this case will focus upon Section 2511(a)(2) and (b), which provides at the statutory level, as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> **. . . .**
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> **. . . .**
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing,

furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

In order to satisfy Section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa.Super. 2021). Grounds for termination pursuant to Section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id*. (citing *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010)). Of particular note to the instant appeal, while a parent's incarceration is not automatically dispositive with respect to termination, it is a relevant and potentially determinative factor to consider pursuant to Section 2511(a)(2):

[I]ncarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing 'essential parental care, control or subsistence' and the length of the remaining confinement can be considered as highly relevant to whether 'the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent,' sufficient to provide grounds for termination pursuant to [Section] 2511(a)(2)

- 13 -

*In re Adoption of S.P.*, 47 A.3d 817, 830 (Pa. 2012).  Overall, we emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties."  *A.H.*, 247 A.3d at 443.

If a petitioner establishes adequate grounds for termination pursuant to Section 2511(a), we then turn to Section 2511(b), which requires that the court "give primary consideration to the developmental, physical and emotional needs and welfare of the child."  23 Pa.C.S.A. § 2511(b).  Our Supreme Court has generally outlined this inquiry, as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis.  We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved.  Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability.  As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider.  The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents.  And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-1106 (Pa. 2023) (cleaned up).

The extent, however, of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (cleaned up). Rather, it is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." *M.E.*, 283 A.3d at 839 (cleaned up). This Court has clarified that it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents. *Id.* We will not disturb such an assessment if the orphans' court's factual findings are supported by the record. *Id.*

We will begin our analysis by reviewing the orphans' court's findings pursuant to Section 2511(a)(2). As to the first element of this subsection, the orphans' court concluded that both Parents suffered from repeated and continued parental incapacities. *See* O.C.O. at 21-23. Specifically, the orphans' court found that Father's long history of felonious and violent behavior, coupled with his regular periods of extended incarceration, constituted a "sufficient basis" for this finding. *See id.* The court aptly summarized its findings with respect to Mother, as follows: "As to Mother, her behavior has been erratic, violent, irresponsible, and inconsistent . . . . Her judgment is poor. Her insight is limited. It is clear that she lacks the protective capacity necessary to provide a healthy, safe, nurturing

environment for children." *Id.* at 23. Our close review of the certified record reveals ample support for the orphans' court's findings.

With respect to Father, his lengthy criminal history and repeated periods of incarceration are undisputed and largely a matter of record. In addition to his extensive criminal background prior to the birth of J.T.C. and the Agency's involvement with his family, Father has also continued his criminal activities throughout these proceedings. Ms. Sterner testified that Father was arrested and imprisoned from December 2021 until April 2022 after he attempted to strangle Mother. *See* N.T., 10/31/23 at 41-43. Ms. Sterner also detailed that Father was charged with simple assault and unauthorized use of a motor vehicle following an incident in July 2022. *See id.* at 61. Thereafter, Ms. Sterner explained that Father was arrested and jailed in connection with a charge of terroristic threats from May 2023 to June 2023. *See id.* at 42. Finally, the day after the first termination hearing, Father himself explained that he had been taken into custody due to an undescribed parole violation. *See* N.T., 1/10/24 at 13. Father averred that his expected release date for this latest period of incarceration was sometime in May 2024. *See id.*

There is similar, overwhelming evidence in the certified record documenting Mother's lack of concern for the Children's safety and her aggressive, violent behavior. Specifically, Mother has engaged in a consistent pattern of aggressive behavior towards service providers and kinship resources. J.T.C.'s dependency records indicate that Mother acted

aggressively towards Paternal Grandmother the same day that she became a kinship care resource to J.T.C. *See* Shelter Care Order, 7/19/21 at 2. Along similar lines, Ms. Sterner testified that Mother engaged in menacing behavior targeting Paternal Aunt after J.T.C. was placed in her care. *See* N.T., 10/31/23 at 53 ("Mother had been calling the cops on [Paternal Aunt] and driving by the house and just being aggressive towards [Paternal Aunt]. We felt that the [C]hildren were not safe in the [Paternal Aunt's] home, and we had requested that they be moved to foster care."). This ultimately led to the Agency placing the Children in their third placement, the identity of which remains anonymous due to safety concerns related to Mother. Finally, Mr. Kasberg detailed another incident wherein Mother had attempted to physically confront a Catholic Charities' therapist at the organization's offices after one of Mother's scheduled visitations was cancelled due to her use of aggressive and threatening language. *See id.* at 21-25, 33-34.

In addition to these incidents, Mother has been implicated as both a perpetrator and a victim of domestic violence at multiple junctures during these proceedings. Specifically, Ms. Sterner testified regarding the incident in December 2021, wherein Mother was allegedly strangled by Father. *See* N.T., 10/31/23 at 41-43. There are also indications that Mother was a victim of domestic violence perpetrated by J.J. on at least one half-dozen instances, including an episode in October 2022 when J.J. dragged Mother out of a vehicle by her hair. *See* Amended Status Review Order, 12/21/22 at 2-3.

Then, on Easter Sunday of 2023, Mother was involved in the roadside altercation, which Parents described in their respective testimony. *See* N.T., 1/10/24 at 16, 21, 83-84. Finally, the testimonies of Mother and Ms. Sterner revealed that Mother was arrested and imprisoned between July 2023 and August 2023 after she was accused of stabbing J.J. during another domestic incident. *See* N.T., 10/31/23 at 43; N.T., 1/10/24 at 73-74.

The above evidence indicates that both Parents suffer from continued and persistent incapacities, namely, their inability to curb their lawless behavior, the ease and frequency with which they resort to intimidation and physical violence, and their lack of concern for the Children's safety. The first prong of Section 2511(a)(2) is satisfied in the above-captioned cases.

Furthermore, the certified record also supports the orphans' court's conclusion that Parents' incapacities have caused the Children to be without essential parental care, control, and subsistence. As a mere demonstration, the records of the underlying dependency proceedings speak to the circumstances of the Agency's initial involvement, wherein Mother left J.T.C. in the care of her subconscious mother, which resulted in J.T.C. wandering in the public spaces of a hotel in the early morning hours unattended. *See* Order of Adjudication and Disposition, 9/10/21 at 2-3. More pointedly, Ms. Sterner generally opined that Mother's lack of self-awareness and inability to control her behavior raised significant concerns regarding the Children's safety in her care. *See id.* at 70-71. Indeed, both of the Children were exposed to a risk

for physical harm during Parents' fight on April 9, 2023, as Father conceded during his testimony at the termination hearing. *See* N.T., 1/10/24 at 22.

With specific respect to Father, we also note that he has been a virtual stranger to the Children as a result of his long periods of incarceration and transient existence. At the time of the termination hearing, Ms. Sterner averred that Father had not had any contact with J.T.C. for over nine months. *See* N.T., 10/31/23 at 51. She also testified that Father had only interacted with S.Y.C. on one occasion, *i.e.*, the incident on April 9, 2023. *Id.*

Based upon the foregoing, we also conclude that the second element of Section 2511(a)(2) has been established in the above-captioned cases.

Finally, we turn to the final prong of Section 2511(a)(2), which considers whether Parents' respective incapacities cannot, or will not, be remedied. *See* 23 Pa.C.S.A. § 2511(a)(2). Once again, the certified record definitively supports the orphans' court's holding.

With respect to Mother, Ms. Sterner testified that she lacks any awareness of the extent of the seriousness of her parental incapacities. *See* N.T., 10/31/23 at 70-71 ("Mother has refused to even begin to acknowledge the safety concerns and reasons that have brought the [C]hildren into care."). Along similar lines, a parenting assessment indicated that Mother has "poor judgment" and avoids "accepting responsibility for her behavior." CYF Exhibit 9 at 5. Although Mother was enrolled in mental health and domestic violence treatment with CCG from April 2022 through April 2023, Ms. Sterner testified

that she was unsuccessfully discharged around the same time the Children were removed from Parents' custody for a second time. *See* N.T., 10/31/23 at 63. Mr. Kasberg similarly testified that Mother was unsuccessfully discharged from Catholic Charities' program in June 2023 after the above-described incident when she attempted to instigate a physical confrontation with one of the organization's therapists. *See id.* at 21-25, 33-34.

Furthermore, Ms. Sterner reported that Mother had expressed her desire to cease participation in all services offered by the Agency. *See id.* at 71 ("Mother, at the last court hearing, had reported that she didn't want to work with anymore services from the [A]gency."). Indeed, Mother averred that she did not want to continue cooperating with CYF. *See id.* at 13 ("Anything that CYS is saying, I'm not accepting anything, because I've got nothing but disrespect from these people and low blows from these people.").

With respect to Father, his record of improvement is even more lackluster. Mr. Kasberg and Ms. Sterner both reported that Father had been unsuccessfully discharged from Catholic Charities' services in both November 2021 and June 2022 due to his "noncompliance" with the services being offered. N.T., 10/31/23 at 20-21, 61. Additionally, Ms. Sterner explained that Father has failed to complete various assessments, including a threat of harm evaluation, a drug and alcohol evaluation, and a parenting fitness appraisal. *See id.* at 61-62. Owing largely to his frequent periods of incarceration, Father did not participate in any additional services prior to October 2023,

when he participated in a preliminary referral to Pressley Ridge and was assigned an advocate by the program. *See id.* at 62, 89-90. Moreover, Father was slated to be incarcerated until at least May 2024.

This evidence clearly evinces that Parents are neither in a position to address or ameliorate their underlying incapacities, nor is there any meaningful prospect that they will be in the future. Accordingly, we also find that the third prong of Section 2511(a)(2) has also been satisfied.

Overall, we observe no abuse of discretion or error of law in the orphans' court's findings pursuant to Section 2511(a)(2). As set forth above, there is competent evidence that supports the court's relevant findings.

Having concluded that there are sufficient grounds for termination pursuant to Section 2511(a), we now turn to an examination of the orphans' court's findings pursuant to Section 2511(b). As noted above, this inquiry requires the orphans' court to "give primary consideration to the developmental, physical and emotional needs and welfare" of the Children. *See* 23 Pa.C.S.A. § 2511(b). The orphans' court found that there was "no clear bond" between Mother and J.T.C. *See* O.C.O. at 28. In general, the orphans' court found that reunification would not serve the needs and welfare of the Children. *See id.* at 21-28. We must agree.

With respect to the bonding analysis mandated by our Supreme Court, we preliminarily note that Ms. Sterner testified that S.Y.C. is too young at this point to exhibit clear signs of parental bonding with either Parents or Foster

Parents. **See** N.T., 10/31/23 at 58-60. Mother echoed this sentiment in her own testimony, wherein she averred that there had not been enough time and contact for her to establish any manner of bond with a newborn child. **See** N.T., 1/10/24 at 43. It is well-established that, "[i]n cases where there is no evidence of any bond between the parent and the child, it is reasonable to infer that no bond exists." **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa.Super. 2008). Accordingly, we conclude that no evident bond exists between S.Y.C. and either Parents or Foster Parents.

As to J.T.C., the record indicates that he has a negative bond with Mother. Specifically, Ms. Sterner testified that J.T.C. exhibits troubling behavior towards Mother during supervised visits. **See** N.T., 10/31/23 at 54-55 ("[H]e would yell at her, he would call her a fucking bitch, he would tell her to shut the fuck up, he would just yell, jump, and scream on furniture and just cuss."). At the time of these incidents, J.T.C. was four years old. **See id.** at 55. Notably, Ms. Sterner also testified that she had never seen J.T.C. display similar behavior towards any other adults in his life. **See id.** at 96.

With respect to a parental bond with Father, there is no evidence that J.T.C. shares one, inasmuch as he had not seen Father in at least nine months at the time of the termination hearing. **See** N.T., 10/31/23 at 51.

In sharp contrast, Ms. Sterner testified that J.T.C. shared a strong bond with Foster Parents, which was substantially stronger than any bond he shared

with Parents. *See* N.T., 10/31/23 at 57. She also stated that J.T.C. views Foster Parents as his primary parental figures. *See id.* at 58.

With particular respect to J.T.C., we note that there is also substantial evidence suggesting that further contact between him and Parents would not be in his best interest. Ms. Sterner testified that visits with Mother had a negative impact upon J.T.C., as follows: "[T]here would be behaviors with him before visits. He would be very hyper, not want to listen, just not taking direction after visits. More recently after visits, there have been concerns of him urinating and defecating himself sometimes. He struggles with being able to regulate after visits, listening, being hyper." *id.* at 55-56. Specifically, Ms. Sterner relayed that J.T.C. had soiled himself immediately after at least one supervised visit with Mother. *See id.* at 84. Ms. Sterner also explained that J.T.C. was triggered by memories of his Parents' struggles with law enforcement and would react with trepidation whenever he saw police vehicles. *See id.* at 56 ("He would be afraid that the police officers were coming . . . and that someone was in trouble.").

Based upon the foregoing evidence, we find no abuse of discretion or error of law in the orphans' court's finding that terminating Parents' parental rights would best serve the developmental, physical, and emotional needs of the Children. Accordingly, we hold that termination was also warranted pursuant to Section 2511(b) in the matters *sub judice*.

Finally, we conclude our analysis by addressing Mother's claim concerning the orphans' court's denial of her request for a neutral, third-party bonding assessment. Mother argues that "the Agency's witnesses were biased against her and having a neutral third-party, especially an expert witness, would [be] helpful in affirming her position that she had a bond, at least with [J.T.C.], and that severing that existing bond/relationship would have been beneficial to the needs and welfare of the child." Mother's Brief at 35.

We emphasize that, "[i]n analyzing the parent-child bond, the orphans' court is **not** required by statute or precedent to order a formal bonding evaluation be performed by an expert." *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa.Super. 2008) (emphasis added). Furthermore, "Section 2511(b) does not require a formal bonding evaluation." *In re D.L.B.*, 166 A.3d 322, 328 (Pa.Super. 2017) (cleaned up). Indeed, Mother's own discussion of this issue acknowledges that there is no concrete legal support for her position. *See id.* at 35 ("[T]here is no requirement . . . that a bonding assessment be completed by an expert witness or otherwise."). As discussed above, we observe no abuse of discretion or error of law with respect to the orphans' court's findings pursuant to Section 2511(b) based upon the evidence of record.

Mother has provided no citations to persuasive and on-point legal authorities in support of her contention that she was entitled to the benefit of an independent bonding assessment at the County's expense. This Court has rejected arguments identical to Mother's due to a dearth of apposite legal

authority. *See In re S.H.*, 879 A.2d 802, 805 (Pa.Super. 2005). As such, we conclude that this claim lacks merit. *See id.* ("Given Mother's failure to cite apposite legal authority, . . . we find no error in the trial court's denial of Mother's request for the court to provide a psychological evaluation of [the child] using public funds."). No relief is due.

Thus, we affirm the decrees involuntarily terminating Parents' parental rights to J.T.C. and S.Y.C. pursuant to Section 2511(a)(2) and (b).

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 09/06/2024